12-10-00027-CR



FILED IN COURT OF APPEALS
12th Court of Appeals District

MAR - 5 2013

TYLER TEXAS
CATHY S. LUSK, CLERK


# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1214-11

### JASON THAD PAYNE, Appellant

v.

### THE STATE OF TEXAS

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE TWELFTH COURT OF APPEALS
## WOOD COUNTY

KEASLER, J., delivered the opinion of the Court, in which KELLER, P.J, PRICE, WOMACK, JOHNSON, HERVEY, COCHRAN, and ALCALA, JJ., join. COCHRAN, J., filed a concurring opinion. MEYERS, J., filed a dissenting opinion.

## OPINION

In an unpublished opinion, the Twelfth Court of Appeals held that Jason Payne's capital murder conviction was supported by legally sufficient evidence, and that several erroneously admitted victim statements were harmless.[1] While we agree the evidence was legally sufficient to support Payne's conviction, we remand this case for a new trial because

---

[1] *Payne v. State*, No. 12-10-00027-CR, 2011 WL 1662856, *5 (Tex. App.—Tyler, April 29, 2011) (not designated for publication).

the court of appeals erred in concluding that the admission of the statements was harmless.

## I. Factual and Procedural Background

At 9:09 a.m. on December 11, 2007, Payne called 911 from his house, told the operator that his wife and step-son had been shot and requested help. The Wood County Sheriff's Deputies who responded encountered Payne with his daughter standing on the driveway leading to his house. Upon searching the house, Lieutenant Miles Tucker found Payne's wife, Nichole, lying dead in her bed with a gunshot wound to her head. He noticed the strong smell of gunpowder in the room, and that Nichole's body was warm to the touch. Lt. Tucker subsequently found Payne's teenage stepson, Austin Taylor Wage,[2] dead in his bedroom. He had been shot in the face—and based on Lt. Tucker's observation of the stippling on Austin's face—at relatively close range. Austin's cold, stiff body was found lying back on his bed, with his feet on the floor, and a rifle standing upright between his legs. Lt. Tucker did not smell gunpowder in Austin's room, nor did he observe blood or brain matter on the ceiling or wall in Austin's room as he did where Nichole was found.

No signs of struggle or forced entry into the home were noticed at the scene. A shell casing, which was forensically determined to have been fired from the rifle resting against Austin, was found on the floor of Austin's room near his body. Another was located in the rifle. A badly mutilated projectile was found upon removal of Austin's body. The projectile

---

[2] The record frequently refers to this victim as "Taylor." But the court of appeals's opinion used the name "Austin." For consistency, we do as well.

was unable to be forensically analyzed, but was consistent with the rifle's gauge. The officers also discovered clothes, including a man's coat, in the clothes dryer which were still warm when they searched the scene. The officers also searched Payne's truck parked just outside the house. There, they found a white wash cloth which contained bright red, fresh blood. Upon a broader search of the property, officers discovered two large holes in a wooded area some distance from the house, which witnesses described as resembling graves that were mechanically or physically dug. However, other than testimony that the holes were noticed in late November 2007, the State presented no additional evidence concerning the holes.

Later that day, officers interviewed Payne, who denied any involvement in the deaths. The interview was video recorded and shown to the jury. He explained to the officers that he left home with his five-year-old son and his two-year-old daughter around 8:00 a.m, dropped his son off at school, and then returned home. As he pulled into the driveway, he claimed he turned around to head into town to get pigeon feed for Nichole's bird business because they ran out. They made it about half way to town when his daughter said she wanted to go to the park. Payne stated that, before going to the park, he thought he should inform Nichole of their plan to do so, and he returned home around 8:15 a.m. But instead of going inside the house to speak to Nichole, Payne said he and his daughter went to throw acorns into the creek on their property. After they were done playing by the creek, Payne and his daughter went to check on the birds. He claimed they then went into the house to ask

Nichole where the bird seed was located when he discovered the bodies of Nichole and Austin. He did not check to see if either were alive or breathing, nor did he touch them or try to wake them. He recognized the rifle near Austin's body as his ".30-30" that he kept in the hall closet. Payne stated he and Nichole had a "fallout" the night before, but claimed that it was over "little stuff." He maintained that he and Nichole did not have any marital or financial problems. He acknowledged receiving approximately $300,000 from a personal injury settlement, though he stated that after seven or eight months very little of it remained.

Through witness testimony and documentary evidence, the State attempted to show the Paynes' poor financial situation. With the settlement proceeds, the Paynes made substantial purchases, including a home without a mortgage and three cars. At the time of Nichole's death, the couple's bank records indicated that their account was overdrawn in excess of $200. Payne's unemployment due to his injuries and the Paynes' reliance on a thirteen-percent loan from an attorney caused Nichole to become depressed, for which she sought medical treatment and was prescribed an anti-depressant. Also, Payne attempted to sell his fishing boat in a hurried manner. Payne told the buyer that he wanted to sell his boat in a single day so he could allegedly buy another boat. He sold it for $13,000, which was $5,000 less than his outstanding loan on the boat. When the buyer returned a few days later to finish the paperwork necessary for the sale, he did not see any boat on the property. Additionally, in the few months before her death, Nicole began sending her ex-husband postcards telling him that the couple needed money.

When Nichole and Payne purchased auto and home insurance, the staff at the insurance agent's office asked them if they would also like to purchase life insurance. They were initially interested. In June 2007, a month or so after the solicitation, Nichole and Payne each applied for individual $250,000 life insurance policies with riders for their children. However, after the policies' premiums were calculated approximately fifteen percent higher than previously quoted for Nichole and significantly higher for Payne, the Paynes chose only to secure a $100,000 life insurance policy for Nichole with $10,000 riders for the children which named Jason Payne as the primary beneficiary. Following the deaths of Nichole and Austin, the insurance agent submitted a claim to State Farm on his own initiative. When asked to give a recorded statement about the deaths, Payne refused and was consequently unable to collect on the policy.

The jury also heard testimony that Nichole and Payne's marriage was not a happy one. Nichole's father testified that Payne did not want Nichole to have contact with her family. Nichole's ex-boyfriend testified that Nichole called him approximately two months before her death and expressed that her marriage caused her to be "as unhappy as she ever had been in her life" and that she was planning on getting a divorce. Sarah Hawthorne, Nichole's sister-in-law and best friend, recalled discussing the marital relationship with her in August 2007. Nichole told her that she wanted a divorce and that Payne had threatened to burn her alive in the house. According to Hawthorne, Nichole was upset and "begged me . . . to avenge her if something happened to her." After the visit, Hawthorne and Nichole frequently

spoke about Nichole's relationship with Payne. At times, Nichole would call Hawthorne from the closet or from the back of their property, away from their house. Hawthorne last spoke to Nichole the night before her death. Nichole was upset, and again repeated that she wanted a divorce and that Payne had threatened to kill her.

The forensic testing on the recovered items at the scene did not affirmatively establish the perpetrator's identity. No identifiable finger prints or smudges were found on the rifle or the shell casings. No blood was found on the clothes collected from the dryer. According to the forensic expert, machine washing does not typically remove all forensically detectable blood. Although no gunshot residue was detected on Payne's hands, residue was detected on the back of Nichole's left hand and a single particle was detected on the back of Austin's right hand. DNA testing confirmed that the blood found on the wash cloth was Nichole's and the clothes Austin was wearing contained only his blood, not Nichole's.

Dr. Keith Pinckard, the medical examiner who performed the autopsy on Nichole's body and supervised Austin's autopsy, testified that Nichole's cause of death was a gunshot wound to the back of the head. The gaping exit wound was consistent with that caused by a high-powered rifle fired at close range. The manner of death was identified as homicide or, as described by Dr. Pinckard, "death by the hands of another." Dr. Pinckard testified that Austin's cause of death was a gunshot wound to the face, with the entry point being his upper lip and the exit wound located on the back of his head toward the right side. The path of the bullet was front to back, upwards, and slightly left to right. The presence of soot and

stippling on Austin's face indicated that the gun was fired at a relatively close range. Dr. Pinckard listed Austin's manner of death as undetermined because the nature of the wound and the estimated range of fire raised the question of whether it would have been possible for Austin to position and fire the rifle himself. Noting the intermediate range from which the wound was inflicted, Dr. Pinckard could not rule out suicide.

Whether Austin shot Nichole and then committed suicide was a significant defensive issue at trial. More specifically, the issue evolved into whether it was physically possible for Austin to have committed suicide using the rifle found at the scene. The State introduced the testimony of several witnesses who attested to Austin's reputation for being peaceful and nonviolent. But both sides devoted considerable expert testimony to the subject, with each party's experts contesting the opposing experts' testing protocols and ultimate conclusions. During his investigation, Lt. Tucker sought the assistance of Noel Martin, a crime scene investigator with the Smith County Sheriff's Office, to give his assessment of what likely occurred at the scene. Martin concluded that Austin committed suicide and was probably responsible for Nichole's death. However, Lt. Tucker had reservations about Martin's opinion. Noting several inconsistencies with that conclusion, including the nature of Austin's wound which indicated a non-contact wound, his experience that suicides typically involve contact wounds, no visible blowback blood found on Austin's clothing, and no apparent blood spatter on the walls or ceiling of Austin's room, Lt. Tucker believed that the scene had been staged to look like a murder-suicide. He sought additional assistance from

Tom Bevel, a crime-scene reconstructionist, and Richard Ernest, a firearms expert.

Bevel testified that the lack of blood on Austin's finger, his pants, and the floor nearby was inconsistent with the theory that Austin committed suicide. In reviewing the crime scene photographs, Bevel did not observe any of the forward spatter that would have originated from the exit wound, and the amount of blood found on Austin's hand was greater than the small amount he would have expected from blowback or blood spatter from the entry wound. The positioning of the gun when discovered, in his opinion, was inconsistent with having been being fired at a 45-degree angle because the significant recoil of the rifle would have caused the gun to "kick outward" against the hard surface found in Austin's room. Bevel further testified that, based on the lack of blood in one location and lack of blood in the carpet and on Austin's lower extremities, he would not expect the rifle to have been found resting against the top of Austin's hand.

Through his test firing of the rifle and his observations of the soot and the spread of gunpowder particles from the rifle when fired led Bevel to concluded that the rifle was eight to ten inches from Austin's face when fired. Bevel also concluded that positioning the rifle in a manner consistent with the trajectory of the bullet and holding the rifle no closer than eight inches from the face, it would have been very difficult for Austin to fire the rifle using his hand to manipulate the trigger based on his arm length. In his opinion, it would have been impossible for Austin to fire the rifle in this manner holding the rifle beyond eight inches. Further, the mechanical function of the rifle, namely having to press the safety and

pull the trigger to fire the rifle, added to the difficulty of firing from this eight- to ten-inch range. Bevel discounted the theory that Austin could have fired the weapon using his toe to depress the trigger. In previous cases where Bevel concluded this type of firing occurred, he witnessed an indentation in the sock of the person caused by placing a toe in the trigger guard. Bevel did not see any indentation in Austin's socks in the photographs taken at the scene. Lastly, Bevel concluded that the evidence was more consistent with the theory that Payne shot Nichole and Austin. He referred to the lack of evidence suggesting a third party's presence in the house, the fact that there were no signs of a struggle or forced entry, the temperature differences between the bodies, and the strong smell of gunpowder in Nichole's room and the absence of it in Austin's room.

Richard Ernest, the State's firearm expert, concluded that the muzzle-to-target distance was twelve inches, plus or minus two inches. He further opined that, based on the length of the rifle, the trigger location, and the muzzle-to-target distance, for Austin to have fired the rifle he would have had to hold the barrel while working the safety lever and trigger with both feet or use a long device not found at the scene. While stopping short of claiming that it would be impossible, he testified that it was unlikely that Austin shot himself.

Testifying for the defense, Noel Martin agreed with the State's witnesses that Nichole was shot in the head with the recovered rifle from a distance of less than an inch away while asleep in her bed. With respect to Austin, Martin testified that not only was it physically possible for Austin to shoot himself with the rifle, but that Austin's death was indeed a

suicide. When Austin shot himself, Martin believed he was seated on the bed, holding the rifle with his right hand at or near the muzzle with the rifle's butt end resting on the floor and the rifle positioned at a 45-degree angle. And from his testing of the rifle, he opined that it was possible for Austin to fire the rifle while positioning the muzzle four to eight inches (plus or minus two inches) away from his face. Even though he believed Austin used his hands to fire the rifle, Martin concluded that he could have used his foot and held the rifle up to twenty inches away from his face. In his opinion, the rifle's safety mechanism did not require a lot of pressure and was easily defeated.

Martin based his suicide conclusion on finding atomized blood on the carpet located in front of Austin's body, the soot pattern found on Austin's face indicating an upward trajectory, and a blood stain on Austin's thigh that appeared to strike his leg at a 90-degree angle, which is consistent with Martin's theory of how Austin was positioned at the time the gun was fired. Martin took issue with the State's theory that the scene was staged. First, he noted that the blood found on the rifle and the lack of blood in other places was consistent with the way the rifle was found and that it was not moved. Second, he testified that it is impossible to tell where a rifle will end up after being fired. Third, he claimed that it was not possible that Austin was shot in another location because the high-velocity blood spatter found on his hand would be impossible to stage.

Ed Hueske, Payne's firearms expert, also concluded that Austin shot himself with the rifle while seated on the bed with his feet on the floor, but believed the muzzle-to-target

distance was between four and ten inches. From his dry-fire testing of the rifle, he too concluded that Austin would have been able to fire the rifle manually or with his toe. Because a foot falling to the floor could straighten out a wrinkle or crease in a sock, Hueske opined that the lack of a visible crease or wrinkle in Austin's sock did not rule out the possibility that Austin fired the rifle with his toe.

The jury convicted Payne of capital murder, and because the State did not seek the death penalty, he was sentenced to life imprisonment. He appealed, arguing that the evidence was legally insufficient to support his conviction and that he was harmed by the trial court's erroneous admission of several hearsay statements admitted through Sarah Hawthorne's testimony. We granted review of these two issues which the court of appeals resolved against him.

## II. Legal Sufficiency

In finding the evidence sufficient, the court of appeals dismissed the State's circumstantial evidence and focused exclusively on the forensic evidence both sides presented. The court further focused its legal-sufficiency analysis on whether a jury could have concluded that Austin did not shoot himself. After reviewing the forensic evidence, the court determined that Payne's theory was implausible if not impossible. It found compelling the State's expert testimony about the position of Austin's body which rebutted Payne's theory of the shootings. The court stated:

Taking this forensic evidence together, and viewing it in a light

favorable to the verdict, we hold that a rational jury could have concluded that Austin did not take his own life. That determination flows fairly directly to the conclusion that Appellant is the person who shot Nichole and Austin. There were other possibilities: Austin could have shot Nichole and Appellant shot Austin, or an unknown third party could have shot Austin or Nichole. But once the jury concluded that Austin did not shoot himself, the conclusion that Appellant shot them both is reasonable.[3]

While we agree with the court of appeals's judgment that the evidence is legally sufficient, we find the analysis it used in arriving at its conclusion improper. The court of appeals discounted the value of the State's circumstantial evidence when it found, for instance, that "[t]he blood on the rag is not bright red, many married couples have life insurance, the evidence is inconclusive as to whether the family was in any financial distress, and [Payne's] denial of marital issues is neither surprising nor as unequivocal as the State suggests it was."[4] By disregarding this evidence's potential probative value, the court of appeals injected an inappropriate "divide-and-conquer" approach into its analysis and failed to consider all of the evidence presented at trial.[5] After finding that the circumstantial evidence was alone insufficient to support the verdict, the court of appeals framed the legal-sufficiency issue as "whether the jury could have concluded that the forensic evidence showed that Austin did not shoot himself."[6] Framing the issue in this manner to incorporate

---

[3] *Payne*, 2011 WL 1662856, at *5.

[4] *Id.*

[5] *See Merritt v. State*, 368 S.W.3d 516, 527 (Tex. Crim. App. 2012).

[6] *Payne*, 2011 WL 1662856, at *5.

a defensive theory is reminiscent of the reasonable alternative hypothesis test long since abandoned.[7] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[8] Applying this standard to the offense charged in this case, the question is whether any rational jury could have found that Payne intentionally or knowingly caused the deaths of Nichole and Austin during the same criminal transaction.[9]

While we agree with the court of appeals's description of Payne's trial as "a contest between two narratives"[10] told primarily through their respective experts' testimony, a proper legal-sufficiency analysis does not permit a reviewing court to evaluate the evidence based on which theory it views as more compelling. The proper standard accounts for the factfinder's duty—the jury in this case— "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[11] Therefore, in analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed

---

[7] *See Laster v. State*, 275 S.W.3d 512, 520-21, 522-23 (Tex. Crim. App. 2009).

[8] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).

[9] *See* TEX. PENAL CODE § 19.03(a)(7)(A) (West 2006).

[10] *Payne*, 2011 WL 1662856, at *3.

[11] *Jackson*, 443 U.S. at 319.

in the light most favorable to the verdict."[12]

"Our review of 'all of the evidence' includes evidence that was properly and improperly admitted."[13] When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.[14] Direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."[15]

In viewing the evidence in the light most favorable to the jury's verdict, we find the evidence is sufficient to sustain Payne's conviction. It was uncontested that there were no signs of struggle or forced entry into the home and that the injuries Nichole and Austin suffered were caused by or were consistent with Payne's rifle that was found standing between Austin's legs.

In his recorded interview with law enforcement, Payne made several inculpatory statements. Further, these statements demonstrate an attempt to conceal incriminating

---

[12] *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).

[13] *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

[14] *Jackson*, 443 U.S. at 326.

[15] *Hooper*, 214 S.W.3d at 13.

evidence and contain implausible explanations of his conduct on the day of the murders.[16] First, Payne's recounting of the time line of the morning's events indicated that he had the opportunity to shoot Nichole and Austin that morning. According to Payne, he returned home from dropping his son off at school around 8:15 a.m. However, he did not call the police to report the shooting until 9:09 a.m. When he discovered the bodies, he did not check to see if they were alive or attempt to revive them.

Second, as the State asserted in its closing argument, Payne's explanation of his conduct that morning was "illogical." Payne's explanations as to why he first turned around to head into town for birdseed and then turned around again to tell Nichole that they were going to the park were undermined by what he later did when he returned home. When he finally returned home, he did not attempt to tell Nichole that they were going to the park, and when he entered the house, he did so only to ask Nichole where the birdseed was located, even though he claimed that they were out.

Third, based on other admitted evidence, the jury could rationally conclude that Payne was purposely dishonest about his marital relationship and the couple's financial condition. Not only was the jury able to make an adverse credibility determination, there was evidence to permit a jury to conclude that Payne had a motive and the intent to commit the crime in

---

[16] *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (stating that "[a]ttempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt.").

that their marital relationship was unhappy, he made previous threats to kill Nichole, and they were experiencing financial distress. The jury heard from witnesses who stated that Payne did not want Nichole to have contact with her family, that Nichole told them she was very unhappy in her marriage, that Payne had previously threatened to kill her, and that Nichole told Hawthorne that she should "avenge" her death should anything happen to her. According to Payne, he and Nichole had an argument the night before her death. Also on the night before her death, Nichole repeated her desire to obtain a divorce and claimed that Payne threatened to kill her.

Payne's admission of the dwindling settlement proceeds, the overdrawn bank account, the hurried sale of his boat at a loss, Payne's unemployment, postcards from Nichole to her ex-husband asking for money, and the meager income from Nichole's bird business is sufficient evidence from which a jury could conclude that the family was experiencing financial pressure. While he was the beneficiary on Nichole's life insurance policy secured approximately six months before her death, it was Payne's refusal to give a recorded phone call concerning Nichole's and Austin's death that prevented him from collecting on Nichole's insurance policy. A juror could properly infer that Payne's unwillingness to give the insurance company a recorded statement suggested Payne's involvement in the deaths, especially in light of the on-going police investigation which identified him as a potential suspect.

Despite conflicting expert testimony, the jury also could have reasonably concluded

that the scene was staged to look like a murder-suicide. The State's experts concluded that the scene was staged when considering the position of the rifle found near Austin, the nature of Austin's wound, the type of weapon used, and the minimal amount and nature of the biological material found near Austin. Even though witnesses noted alternative explanations were possible, the lack of fingerprints on the recovered rifle was also consistent with the State's theory that the weapon was wiped off before being placed in Austin's lap. Had Austin fired the rifle, the State's forensic expert testified, he would have expected to find Austin's fingerprints or some indication that the weapon had been handled. As described previously, there was extensive, albeit conflicting, expert testimony concerning the muzzle-to-target distance and whether it was physically possible for Austin to fire the rifle from that calculated distance. However, the resolution of conflicting witness testimony is rightly within the province of the jury; we cannot sit as the proverbial "thirteenth juror."[17] When confronted with conflicting theories and testimony, we defer to the jury's determination and conclude that the jury must have resolved these conflicts in favor of its verdict.

While each piece of evidence lacks sufficiency when viewed in isolation, the totality of the evidence, coupled with the reasonable inferences drawn from that evidence, is legally sufficient to support Payne's capital murder conviction.

### III. Nichole's Statements and Harmless Error

---

[17] *Brooks v. State*, 323 S.W.3d 893, 899-902 (Tex. Crim. App. 2010).

The court of appeals found the following portions of Sarah Hawthorne's testimony were inadmissible hearsay and erroneously admitted: (1) on the night before her murder, Nichole said that Payne threatened to kill her; (2) Nichole stated that Payne threatened to kill her in the past; and (3) Nichole stated that Payne threatened to burn her alive in the house and begged Hawthorne to "avenge" her death should anything happen to her.[18] Finding these errors harmless, the court of appeals stated that "the only plausible conclusion about the evidence is that the jury concluded that Austin could not have shot himself based on the physical evidence. In that context, the verdict rests on very substantial grounds and the admission of Nichole's hearsay statements had little or no effect on the verdict."[19]

Payne maintains that, while it applied the correct harm analysis, the court of appeals erred in its conclusion that the admitted statements were harmless. In its reply brief, the State claims that Payne failed to preserve this issue for appeal and, alternatively, the court of appeals incorrectly held that admitting these portions of Hawthorne's testimony was erroneous. However, the State did not raise these claims in a cross-petition for discretionary review; therefore these issues are not before us for review.[20] Although error preservation is

---

[18] *Payne*, 2011 WL 1662856, at *7-8 (concluding that the statements were hearsay and did not satisfy the exception found in Texas Rule of Evidence 803(3) ("Then Existing Mental, Emotional, or Physical Condition")).

[19] *Id.* at *8.

[20] *See Batiste v. State*, 888 S.W.2d 9, 10 n.1 (Tex. Crim. App. 1994); *Haughton v. State*, 805 S.W.2d 405, 407 n.4 (Tex. Crim. App.1990); *Keith v. State*, 782 S.W.2d 861, 863 n.4 (Tex. Crim. App. 1989); *Wilson v. State*, 772 S.W.2d 118, 120 n.3 (Tex. Crim. App. 1989).

a systemic requirement that a discretionary review court may address on its own motion if warranted by the circumstances, we find no occasion to review the issue in this case in light of the court of appeals's finding that the error was properly preserved.[21] Because we granted review only to address the court of appeals's harm analysis on this issue, we assume, without deciding, that the admission of these statements was error.

Texas Rule of Appellate Procedure 44.2(b) provides that an appellate court must disregard a non-constitutional error that does not affect a criminal defendant's "substantial rights."[22] A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.[23] If the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such non-constitutional error is harmless.[24] The question is not whether there was sufficient evidence to support the verdict without the erroneously admitted evidence.[25] Instead, we must examine the entire

---

[21] *See Jones v. State*, 942 S.W.2d 1, 2 n.1 (Tex. Crim. App. 1997); *Payne*, 2011 WL 1662856, at *6, n.4.

[22] TEX. R. APP. PRO. 44.2(b) ("*Other errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *see Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (applying Texas Rule of Appellate Procedure 44.2(b) to improperly admitted statements from deceased victim).

[23] *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).

[24] *Id.*

[25] *See Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003).

record and calculate the probable impact of the error upon the rest of the evidence.[26]

We disagree with both the court of appeals's harmless error analysis and its conclusion. Like its legal-sufficiency analysis, the court of appeals improperly focused on the jury's rejection of Payne's defensive theory that Austin shot himself and failed to evaluate the entire record. While the totality of the evidence is legally sufficient to sustain Payne's capital murder conviction, it was certainly not overwhelming. The jury's verdict was primarily supported by the cumulation of arguably weak circumstantial evidence. There were no eyewitnesses; nor was there forensic or direct evidence clearly linking Payne to the deaths. In the absence of direct evidence, establishing Payne's motive to kill Nichole was a critical component of the State's case. Hawthorne's testimony that Payne threatened to kill Nichole in the past, that Nichole asked her to "avenge" her should anything happen, and that Payne again threatened Nichole's life the night before her death were among the most inculpatory pieces of the State's evidence.

This testimony was not merely cumulative of Nichole's fear of Payne, her unhappiness in her marriage, and her desire to divorce him; it forcefully established Payne's motive and intent to murder Nichole in a manner other evidence adduced at trial, including Nichole's other statements, could not. Without the admitted statements, the State's motive and intent theory relied upon the Paynes' unhappy marriage and Payne's desire to remedy his dire financial condition with the proceeds of Nichole's life insurance policy. Unlike the argument

---

[26] *Coble*, 330 S.W.3d at 280.

that the marriage was an unhappy one, the life insurance theory has ambiguous support in the record. While the jury could have rationally inferred that Payne's desire for the insurance proceeds was the motive for Nichole's murder, the inference is not a particularly strong one. Payne did not seek out life insurance for himself and Nichole; it was obtained in response to a solicitation seven or eight months before Nichole's murder. Upon hearing about the deaths, the insurance agent submitted the claim on his own initiative. There is no evidence that Payne ever made a claim on Nichole's policy or that Payne asked the agent to submit the claim on his behalf. Payne's refusal to give the insurance company a recorded statement alone does not prove that he murdered Nichole for the insurance proceeds.

Nichole's statements that Payne had threatened to kill her directly established Payne's motive unlike the State's other theories which required the jury to infer it. Further, Hawthorne's powerful testimony that Nichole asked her to avenge her if something happened to her in essence allowed Nichole to testify "from the grave" and relay her belief that, if something were to happen, Payne would be responsible. Perhaps these statements would be less compelling had they been made by someone other than the victim or if Payne had been charged with a different offense. However, Payne's repeated threats to kill Nichole—one of which was quite specific as to how he would kill her and another which occurred the night before her death—and Nichole's request for vengeance played directly to an issue before the jury—whether Payne intentionally or knowingly caused Nichole's death. Although it did not belabor Nichole's statements, the State incorporated them into its closing argument and they

significantly supplemented its explanation as to why Payne killed Nichole. These statements most likely had a telling effect upon the jury.

In light of the absence of direct evidence linking Payne to the deaths combined with the statements' indelible character, it is likely that these statements influenced the jury's assessment of the State's circumstantial evidence, the inferences drawn from that circumstantial evidence, and its resolution of the considerable amount of conflicting "battle of the experts"-type testimony in the State's favor. We therefore cannot conclude that Hawthorne's testimony did not influence the jury or had but a slight effect upon its deliberations.

## IV. Conclusion

We affirm the court of appeals's judgment that the evidence is legally sufficient to sustain Payne's capital murder conviction. However, we find that the court of appeals erred in holding the admission of the statements harmless. Accordingly, we reverse the court of appeals's judgment and remand to the trial court for a new trial.

DATE DELIVERED: February 27, 2013

DO NOT PUBLISH



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

NO. PD-1214-11

---

**JASON THAD PAYNE, Appellant**

v.

**THE STATE OF TEXAS**

---

**ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE TWELFTH COURT OF APPEALS
WOOD COUNTY**

---

COCHRAN, J., filed a concurring opinion.

## OPINION

I join the majority opinion. I write separately only to elaborate on why the error in admitting Nichole Payne's out-of-court statements to her best friend, Sarah Hawthorne, was harmful. Sarah's testimony that Nichole (1) told her that appellant had threatened to kill Nichole the night before she was shot; (2) had previously told Sarah that appellant "threatened to burn her alive in the house"; and (3) "begged" Sarah "to avenge her if something happened to her" was inadmissible hearsay. The only issue before us is whether

that testimony could be considered harmless.

A witness who testifies to what the murder victim said before her death frequently gives extraordinarily powerful testimony: The jury hears the victim's Cassandra-like voice rising from the grave predicting her own death, detailing past abuses, and pointing the finger of blame at the defendant. The problem in this case was that the jury heard the voice of what the defense called the "avenging angel" of Sarah Hawthorne,[1] not the words from Nichole herself. Nichole cannot now be asked about her words and their context. This is an example of classic inadmissible hearsay.

The court of appeals was correct in concluding that this case hinged upon which theory, defense or State, the jury believed. According to the defense theory, Austin, appellant's stepson, killed his mother, Nichole, and then shot himself. According to the State's theory, appellant shot and killed them both. Each theory was supported by circumstantial evidence, neither was established by direct evidence.

To prove its theory, the State relied on evidence of appellant's motive to kill Nichole

---

[1] The defense argued,

> The only thing we have to say that was a lie was the State's avenging angel, Sarah Hawthorne, who came to tell all of these things that—he's going to burn her in the house, she has to hide in the closet to make a phone call. It's almost a nightmare scene over there according to Sarah Hawthorne, but, again—and this time, it's Nichole's actions that are speaking so loudly that we can't hear Sarah Hawthorne.

Defense counsel argued that Nichole had her own car, she had her own business, she came and went freely, and other witnesses had testified that this was a normal household. According to the defense, the State was asking the jury to believe a woman who "in her almost hysterical state said that she had vowed to avenge Nichole's death," implying that Sarah Hawthorne had "imagined" false words into the dead woman's mouth.

and the lack of any motive for Austin to kill either his mother or himself. Thus, evidence that Nichole told her best friend that appellant had previously threatened to kill her–and had done so on more than one occasion–was extremely powerful evidence in support of the State's theory. It was powerful, but it was also highly prejudicial. Courts rarely conclude that such hearsay "statements from the grave" by the murder victim are harmless error.[2]

---

[2] *See, e.g. Jones v. State*, 515 S.W.2d 126, 129 (Tex. Crim. App. 1974) (out-of-court statement by murder victim, defendant's husband, three years before killing that he believed defendant was unfaithful to him was inadmissible to show deceased's state of mind and was prejudicial error); *Dorsey v. State*, 24 S.W.3d 921, 928 (Tex. App.–Beaumont 2000, no pet.) (witness's testimony that murder victim said she was thinking of leaving the defendant–her husband–and wanted the name of a divorce lawyer was admissible under Rule 803(3) because it showed her future intent to leave defendant, but testimony that the victim had said that if anything "strange happened to me, like a car crash," it meant that the defendant had killed her was an inadmissible statement of past belief; additional out-of-court statements by the deceased victim that the defendant had held her down on the bed with a knife to her throat, had held a gun to her head, and had put a gun in her mouth were inadmissible because they were memories of past events; in this circumstantial-evidence case, in which the State wove "a story of abuse and fear," the error was harmful); *Barnum v. State*, 7 S.W.3d 782, 789-91 (Tex. App.–Amarillo 1999, pet. ref'd) (trial court reversibly erred in admitting a writing signed by the deceased which, among other things, stated that she believed that the defendant was planning on murdering her to collect the proceeds of her life insurance); *Vann v. State*, 853 S.W.2d 243, 249-50 (Tex. App.–Corpus Christi 1993, pet. ref'd) ( manslaughter victim's out-of-court statement that he "wouldn't be surprised if [defendant–his wife] was waiting for me at home with a gun and shot me" was inadmissible under Rule 803(3) and harmful error); *see also Crow v. State*, No. 07-00-0144-CR, 2001 WL 883006, at *7-8 (Tex. App.–Amarillo Aug. 7, 2001, pet. ref'd) (not designated for publication) (reversible error to admit deceased victim's out-of-court statements that defendant had given her a black eye and busted lip in a circumstantial-evidence murder case in which defense was that deceased was the first aggressor); *Camm v. State*, 908 N.E.2d 215, 225-28 (Ind. 2009) (reversible error to admit murder victim's out-of-court statement that she expected her husband–the defendant–home about 7:30 on the evening she and her children were murdered because evidence of defendant's alibi was conflicting and wife's statement was critical in placing defendant at home when murder occurred); *People v. Smelley*, 775 N.W.2d 350, 358-59 (Mich. Ct. App. 2009) (reversible error to admit murder victim's out-of-court statements that defendant was after him and trying to kill him when only admissible evidence linking defendant to murder was witness who testified he heard shots being fired as defendant's car passed in the opposite direction), *vacated in part on other grounds*, 776 N.W.2d 310 (Mich. 2010); *Blair v. Commonwealth*, 144 S.W.3d 801, 805-06 (Ky. 2004) (reversible error in murder case to admit

In this case, the circumstantial evidence was not overwhelming, and Sarah Hawthorne's testimony was not cumulative of other, similar testimony. Furthermore, the State emphasized the inadmissible testimony during its summation of the evidence. Close to the beginning of his closing argument, the prosecutor noted that appellant had lied to the officers when he told them that his marriage was good. Then he explained how the jury knew that was a lie:

> We know one thing, that Nichole Payne was unhappy, the most unhappy she had been in all of her life. She wanted to get a divorce, that this Defendant had threatened to kill her and threatened to burn her alive in her own house. Do you remember that? Sarah Hawthorne told you that. One of the conversations was the day before this Defendant killed Nichole Payne and Austin Taylor Wages. Did you see how emotional that young lady was? Absolutely almost on the verge of crying.

From there, the prosecutor talked about the couple's financial problems and other circumstantial evidence of appellant's motive to murder Nichole.

During his final argument, the prosecutor again brought up Nichole's out-of-court

---

testimony by victim's friend that victim had told him she had plenty of money to pay for dental work and did not need to wait for check because that testimony supported the inference that money found in defendant's possession on morning of murder had been stolen from victim.); *Crowe v. Commonwealth*, 38 S.W.3d 379, 383-84 (Ky. 2001) (reversible error to admit out-of-court telephone statement made by murder victim three weeks before her death to divorce attorney's secretary that victim wanted to discuss obtaining a divorce when conviction was based on circumstantial evidence, evidence was not overwhelming, and inadmissible testimony was powerful evidence of defendant's motive); *compare Navarro v. State*, 863 S.W.2d 191, 197 (Tex. App.–Austin 1993, pet. ref'd) (admission of deceased victim's statements that the defendant, her live-in boyfriend, had "put a gun to her head and threatened to kill her" was error, but harmless considering the overwhelming undisputed evidence that the defendant had a violent character and had repeatedly threatened the deceased with a gun, sometimes hit her with the gun, once had choked her until she was unconscious).

statements in commenting on appellant's lack of credibility:

> He lied that day [to the police]. He said he had a good marital relationship. And Nichole had told several people she wanted a divorce, she was afraid, she had to have conversations with her family from a closet or she had to get out of the house to have a conversation, that she feared him, that if something happened to her, that her family was to avenge her[.]

Given the circumstantial nature of this case, the power of Nichole's "words from the grave," and the State's emphasis on Sarah's testimony about Nichole's out-of-court statements, I agree that the error in admitting those statements cannot be considered harmless. They were devastating to the defense theory of the case, and they formed the core of the State's theory concerning appellant's motive to kill his wife and stepson.

Filed: February 27, 2013
Do Not Publish



# IN THE COURT OF CRIMINAL APPEALS
## OF TEXAS

### NO. PD–1214–11

### JASON THAD PAYNE, Appellant

v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TWELFTH COURT OF APPEALS
### WOOD COUNTY

MEYERS, J., filed a dissenting opinion.

### DISSENTING OPINION

The majority reverses after concluding that the court of appeals erred in determining that the admission of several erroneously admitted victim statements was harmless. I disagree with this conclusion. After examining the court of appeals opinion, I agree that the admission of the statements was harmless error, and feel that the analysis conducted by the court of appeals is more accurate than the analysis conducted by the

majority. There is no way a rational trier of fact would have reached a different result had the error not occurred.[1]

    With these comments, I respectfully dissent.

                       Meyers, J.

Filed: February 27, 2013
Do Not Publish

---

[1]*Tillman v. State*, 376 S.W.3d 188 (Tex. App.–Houston [14th Dist.] 2012]