Michael C. BLAIR, Appellant,

v.

COMMONWEALTH OF KENTUCKY, Appellee.

No. 2002–SC–0548–MR.

Supreme Court of Kentucky.

Sept. 23, 2004.

36. *See, e.g., Jackson v. Commonwealth,* Ky., 113 S.W.3d 128, 134–36 (2003).

Misty Dugger, Department of Public Advocacy, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Louis F. Mathias, Jr., Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

Following a trial by jury in the Graves Circuit Court, Appellant, Michael C. Blair, was convicted of murder and sentenced to twenty-five years in prison. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting that the trial court committed reversible error in (1) overruling his motion for a directed verdict of acquittal; (2) admitting hearsay statements made by the victim; (3) admitting evidence of Appellant's prior criminal record; (4) admitting irrelevant evidence, *i.e.,* a poem allegedly written by Appellant while in jail awaiting trial; (5) excluding evidence that the detective who investigated the crime was subsequently discharged for participating in the theft of police evidence; and (6) allowing the prosecutor to inject extra-judicial facts during closing argument. Because we agree with Appellant

with respect to issues (2), (5) and (6), we reverse his conviction and remand for a new trial. We will also address the other issues because of the likelihood that they will recur at retrial.

## I. SUFFICIENCY OF THE EVIDENCE.

The victim, Mary Katherine Johnson, was found strangled to death in her Mayfield, Kentucky, home at approximately 1:00 a.m. on April 3, 1999. The medical examiner who performed the postmortem examination estimated that she was killed sometime between 5:30 a.m. and 3:30 p.m. on April 2, 1999. In addition to strangulation, the postmortem examination revealed massive blunt force trauma to the face and head.

Appellant, a resident of Ann Arbor, Michigan, was Johnson's nephew and had been a houseguest in her home during the two weeks immediately preceding her death. During that time, Appellant became acquainted with Wendee Morris, a drug dealer who lived across the street. Appellant found the atmosphere at Morris's residence "fun" and "exciting" and began to spend most of his time there consuming alcohol and crack cocaine. He was engaged in these pursuits at Morris's residence on the night of April 1—2, 1999. Appellant told Morris that Johnson was keeping his money for him, and twice that night left Morris's residence to go to Johnson's residence for money to purchase more crack cocaine. According to Morris, he returned with twenty dollars after the first trip and fifteen dollars after the second trip. At around 8:30 or 9:00 a.m. on the morning of April 2, 1999, Appellant again left Morris's residence to go to Johnson's home for more money. Morris testified that when he returned, Appellant appeared nervous and paranoid and his face and forehead were wet. He was perspir-

ing and had changed his clothing. According to Morris, he was also carrying $600.00—$700.00 in cash, as opposed to the relatively small sums he had brought back from his previous trips.

James Cavitt, a friend of Johnson's, testified that he had last seen Johnson "around daybreak" on April 2nd and that she had given him some money to take care of her dog. She told Cavitt she was leaving town to accompany her brother on a vacation to Michigan and mentioned that she wanted her brother to also take Appellant back to his home in Ann Arbor. When Johnson opened her purse to give him the money, Cavitt saw four one hundred dollar bills in the purse. Shirley Beasley, a neighbor, knocked on Johnson's door around 10:00 a.m. on April 2nd to see if Johnson needed a ride to work. No one responded. Larry Jackson, Appellant's cousin, arrived at the Johnson residence around 11:00 a.m. that day. The door was slightly ajar, but when he went inside and called out, no one answered.

Appellant claimed he discovered Johnson's body when he returned to the residence at about 1:00 a.m. on April 3rd. He summoned Johnson's sister, Vanessa Lawson, and they telephoned emergency services for assistance. A paramedic who arrived shortly thereafter noted swelling and bruising on Johnson's face and blood in her eyes. Her body was in full rigor mortis. He also noticed that her purse and change purse were lying open on the floor and that their contents were strewn across the floor. Assistant Chief Lear and Detective Tracy House of the Mayfield Police Department then arrived and searched the residence. House took the purse and change purse as evidence.

Appellant was arrested for Johnson's murder on April 3, 1999, after the police received information about his behavior from Morris. A jailhouse informant, James

Joy, testified that he shared a jail cell with Appellant while Appellant was awaiting trial and that Appellant confessed to him that he had killed Johnson. Another jailhouse informant, Gerome Owens, was housed in an adjacent cell. He testified that he overheard Appellant telling Joy that he and Johnson had argued because she refused to lend him more money, and that he struck Johnson with a vase or lamp, then strangled her to death and stole her money.

█ Thus, the Commonwealth proved that Appellant had both motive and opportunity to kill Johnson. He went to her residence during the time period within which Johnson was killed for the purpose of obtaining money and returned with several hundred dollars. Two persons who went to Johnson's residence shortly thereafter obtained no response to their knocks and calls. Johnson was observed to have a large sum of money in her purse before Appellant went to her house and the purse was found open and empty near her body after her death. Two persons testified that Appellant confessed to the murder. A reasonable jury could believe from this evidence that Appellant murdered Johnson and stole her money for the purpose of purchasing crack cocaine. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991).

## II. HEARSAY.

█ Cavitt's testimony that Johnson told him that she was going to Michigan and wanted her brother to take Appellant home was admissible under KRE 803(3), the "state of mind" exception to the hearsay rule, because the statements cast light upon her future intentions as opposed to past events. *Crowe v. Commonwealth*, Ky., 38 S.W.3d 379, 383 (2001). However, Cavitt was also permitted to testify that Johnson told him she was disappointed in Appellant and upset that he was not working and not helping her. Cavitt also testified that Johnson told him that "He is on that stuff," and that she did not want to leave him alone in her home while she was in Michigan because she was concerned that he would eat all her food and go through her things. He also testified that Johnson said she was going to have some dental work done and, when he informed her of the cost, that she had saved the money to have the work done and did not need to wait for her check. The statements about Johnson's fears about Appellant also fell within the scope of KRE 803(3) but were inadmissible because they were irrelevant. *Bray v. Commonwealth*, Ky., 68 S.W.3d 375, 381–82 (2002) (victim's statement that she feared defendant fell within "state-of-mind" exception but was inadmissible because victim's state of mind was irrelevant). The testimony that Johnson said she had saved the money for her dental work did not fall within an exception to the hearsay rule, thus was inadmissible. *Moseley v. Commonwealth*, Ky., 960 S.W.2d 460, 462 (1997). The testimony about the money was particularly prejudicial because it corroborated Cavitt's claimed observation of the four one hundred dollar bills in Johnson's purse and supported the inference that the money that Morris observed in Appellant's possession on the morning of April 2, 1999, had been stolen from Johnson.

█ Cavitt was also permitted to describe a telephone conversation in which he talked to both Appellant and Johnson, *viz:*

He called me and they were in an argument over the phone, and he called me and wanted to verify, he said, "Mr. Cavitt, will you tell my Aunt Mary didn't I leave a bag at your house?" And I told her, "yeah," and by then she had the phone. She was talking to him, she

said: "You just ain't no good, you are not going to do anything. You are not trying to work. You don't have no job at Sally's like you said, and you are not going to spend up my money, and eat up my food." And she said, "James, I'll talk to you about it later," and she hung up.

The statements attributed to Johnson were hearsay because they were offered to prove that Appellant had no money of his own and, thus, Johnson was not holding Appellant's money for him, as he had told Morris, again supporting the inference that all of the money Appellant used to purchase crack cocaine on April 1 and 2, 1999, had been obtained from Johnson. Cavitt could neither see nor hear Appellant when these statements were made. He did not testify that Appellant agreed or disagreed with the statements or even that he heard them and did not deny them. Thus, they were not admissible as adoptive admissions under KRE 801A(b)(2). Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.20[4], at 595 (4th ed. LexisNexis 2003) ("A statement may not be admitted as an adoptive admission unless it is established that the party heard and understood the statement and remained silent.") (citing *Ray v. Ray*, 196 Ky. 579, 245 S.W. 287, 290 (1922); *James v. Wilson*, Ky.App., 95 S.W.3d 875, 899 (2002)). *Compare Marshall v. Commonwealth*, Ky., 60 S.W.3d 513, 521 (2001); *Hodge v. Commonwealth*, Ky., 17 S.W.3d 824, 847 (2000); *Griffith v. Commonwealth*, 250 Ky. 506, 63 S.W.2d 594, 596 (1933), *overruled on other grounds by Colbert v. Commonwealth*, Ky., 306 S.W.2d 825, 828 (1957).

 Finally, Vanessa Lawson testified that Johnson complained to her that Appellant was borrowing her money and "eating up her food." These hearsay statements were inadmissible for the same reason as the similar hearsay statements testified to by Cavitt. The trial judge believed that Appellant had "opened the door" to Lawson's testimony during cross-examination by the prosecutor, *i.e.*, when he was confronted with Cavitt's hearsay testimony and asked if Cavitt was lying (*but see Caudill v. Commonwealth*, Ky., 120 S.W.3d 635, 662 (2003), *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 28 (1998), and *Moss v. Commonwealth*, Ky., 949 S.W.2d 579, 583 (1997), all holding that a witness should not be asked to characterize the testimony of another witness as a lie), Appellant responded that it was highly unlikely that Johnson would complain about his eating habits since they ate most of their meals at Lawson's home, or about his failure to get a job since he was only in Mayfield for a short visit. "Opening the door," sometimes referred to as "curative admissibility," occurs when one party introduces an inadmissible fact that opens the door for the opponent to offer similar facts whose only claim to admission is that they negative, explain, or counterbalance the prior inadmissible fact. *Norris v. Commonwealth*, Ky., 89 S.W.3d 411, 414 (2002); Lawson, *supra*, § 1.10[5]. The fact that Appellant and Johnson ate most of their meals at Lawson's home and that Appellant was only on a short visit to Mayfield were not inadmissible facts, thus did not authorize the introduction of inadmissible evidence in rebuttal. Appellant's assertions could have been rebutted by evidence that, *e.g.*, he and Johnson did not eat most of their meals at Lawson's home, or that he intended to stay with Johnson for an extended period of time. However, they were not subject to rebuttal by admission of Johnson's hearsay statements that essentially repeated the equally inadmissible hearsay statements introduced through Cavitt.

The admission of hearsay evidence through the testimonies of Cavitt and

Lawson, standing alone, would warrant reversal for a new trial.

### III. PRIOR CRIMINAL RECORD.

■ While testifying on direct examination, Appellant stated that he had never before been exposed to the type of drug culture he saw at Morris's home. He also claimed that he smoked the crack cocaine in order to "make friends" and "fit in." While Appellant admitted to having used drugs prior to his visit to Mayfield, he claimed that his prior experience with drugs was not on the same scale as it was in Mayfield. The cross-examination of Appellant began as follows:

Q: Mr. Blair, the first thing you said is curious to me, you said you were not used to the element of people you encountered here in Mayfield, did you not?

A: True.

Q: I am curious, someone with your criminal record, who you dealt with when you were in Detroit?

A: First of all, I don't live in Detroit, I live in Ann Arbor. And what do you mean by my criminal record?

Q: Let's see . . . .

At this point, the trial judge interrupted and informed the prosecutor that he could only ask Appellant whether he had been convicted of a felony. The prosecutor resumed questioning as follows:

Q: Have you ever been convicted of a felony?

A: I think so.

Q: You think so?

A: If I was, it was a long time ago.

Q: Try 1998. Would that be correct?

A: Drinking and driving?

Q: What I have with me . . . .

The trial judge called counsel to the bench, where the prosecutor explained that he had documentation showing that Appellant had pled guilty to larceny in February 1998 and was sentenced to sixty days in prison. Although Appellant asserts that this must have been a misdemeanor conviction, a copy of the judgment is in the record and reflects that the conviction was for violating Mich. Comp. Laws § 750.360, a Class G felony punishable by up to four years in prison. Id. § 777.16r. The prosecutor also proffered a conviction of a probation violation in March 1989 for which Appellant was sentenced to 120 days. The underlying offense for the probation violation was receiving stolen property in excess of $100.00, a misdemeanor offense. Mich. Comp. Laws § 750.535(5). The trial judge held that the Commonwealth could question Appellant about the larceny conviction because of his ambiguous response as to whether he had been convicted of a felony but could not question him about the probation violation.

The prosecutor then asked Appellant if the felony conviction was for larceny and Appellant responded by explaining that there had been a break-in at a restaurant where he worked and that he was responsible for ensuring that the building was properly secured but had failed to do so. His employer told him that someone needed to take the blame for the theft so that he could collect on his insurance policy; thus, Appellant explained, he pled guilty to the offense even though he did not commit it.

It appears that the prosecutor initially intended to use Appellant's criminal record for substantive purposes as evidence of bad character to rebut Appellant's claim that, despite his drug use while in Mayfield, he was essentially a good person. KRE 404(a)(1). However, proof of the character of the accused, whether good or bad, for the purpose of proving conduct in conformance therewith, can only be by

reputation or opinion evidence. KRE 405(a). "By providing only for the use of reputation or opinion evidence in this situation, the rule plainly implies a prohibition on evidence of particular acts of conduct." Lawson, *supra*, § 2.20[4], at 116. Thus, the trial court correctly ruled that evidence of prior convictions could only be admitted to impeach Appellant's credibility under KRE 609(a). That rule permits impeachment only by evidence of a prior felony conviction and prohibits disclosure of the nature of the conviction "unless the witness has denied the existence of the conviction." *Id.* The trial court properly permitted the Commonwealth to impeach Appellant with his 1998 felony conviction. We also agree that Appellant's response to the prosecutor's inquiry as to whether he had been convicted of a felony was sufficiently equivocal to permit inquiry into the nature of the conviction.

### IV. THE POEM.

■ Appellant contends it was error to admit into evidence a poem allegedly written by him while he was in jail awaiting trial. James Joy testified that in addition to sharing a jail cell, he and Appellant also shared notebooks, in which Appellant drew pictures and wrote poetry. The Commonwealth asked Joy which of them had written a poem that appeared on the back cover of a notebook and he responded that Appellant had written it. The poem reads as follows:

I'm sorry for all your pain
Sense of betrayal
Healed my broken heart
No one going to shut the door on my life
Accomplishment
Achievement
Corrupted
Temporarily
Out of touch with reality
Subconsciously I blame myself for the suffering
Humiliation
Embarrassment
Unfortunately, truth has nothing to do with justice
We all have skeletons in our closet

The words and phrases, "repressed desires," "losing," "silent screaming," "argue/discussion," "traumatic," "the entire establishment," "anger wastes energy," "reassured," "sympathetically," "absolute jewel," along with some other indecipherable words also appear on the same page as the poem.

■ Appellant argues that these writings should have been excluded as irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. To show that evidence is relevant, only a slight increase in probability must be shown. *Springer v. Commonwealth*, Ky., 998 S.W.2d 439, 449 (1999). The Commonwealth argues that the existence of Appellant's poem on Joy's notebook shows the closeness of their relationship, increasing the credibility of Joy's claim that Appellant confided to him that he had killed Johnson. While the theory is somewhat tenuous, it satisfies the minimal threshold for relevancy.

An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable than not.... It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is

spent, the proposition for which it is offered still can seem quite improbable. Lawson, *supra*, § 2.05[3], at 80 (quoting Edward W. Cleary, *McCormick on Evidence* 542–43 (3d ed.1984)).

■ Appellant asserts that even if the evidence is relevant, it should have been excluded under the balancing test of KRE 403, *i.e.*, its probative value was substantially outweighed by the danger of undue prejudice, confusion of the issues, and misleading the jury. There is nothing in the poem that tends to incriminate Appellant or impugn his character. We perceive no abuse of discretion in its admission into evidence. *Commonwealth v. English*, Ky., 993 S.W.2d 941, 945 (1999).

## V. EVIDENCE OF WITNESS'S OFFICIAL MISCONDUCT.

■ Mayfield Police Detective House was the lead investigator in this case. He searched Johnson's residence in the early morning hours of April 3, 1999, and took Johnson's purse and change purse into custody as evidence. By the time the case was brought to trial, House had been discharged from the Mayfield Police Department and had a pending criminal charge against him for complicity to official misconduct. On cross-examination of Appellant, the prosecutor asked, "Didn't you find it odd that the police didn't find any money at all in the house?" Appellant responded that the police very well could have found money and kept it for themselves. In support of this theory, Appellant unsuccessfully sought to introduce evidence of the reason for House's discharge from the Mayfield Police Department. House testified on avowal that the official misconduct charge arose out of his failure to prevent his supervisor from selling a VCR out of the evidence room. The trial judge excluded this evidence as irrelevant. Appellant asserts that the evidence was admissible both for purposes of impeaching House's credibility and to support his theory that House, not Appellant, stole Johnson's money.

At the time this case was tried, KRE 608 provided that the credibility of a witness could be attacked or supported only by evidence in the form of opinion or reputation in the community. Thus, specific instances of wrongful conduct could not be used for impeachment purposes. *See also* CR 43.07. Thus, evidence of House's participation in a theft of property in police custody was inadmissible for the purpose of impeaching House's credibility. The rule as amended in 2003 still does not permit proof of specific instances of conduct by extrinsic evidence, but they may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness: (1) concerning the witness' character for truthfulness or untruthfulness . . . ." KRE 608(b) (as amended). However, the pre–2003 version of the rule must also be applied at retrial. KRE 107 refers to criminal actions "originally brought on for trial" prior to the effective date of the rules with the proviso that "no evidence shall be admitted *against* a criminal defendant in proof of a crime committed prior to July 1, 1992, unless that evidence would have been admissible under evidence principles in existence prior to the adoption of these rules." KRE 107(b) (emphasis added). Although KRE 107 deals only with the effective date of the adoption of the rules, *i.e.*, July 1, 1992, the same principles should apply to the adoption of amendments to the rules. However, as pointed out in the Commentary to KRE 107, "cases tried . . . under pre-existing evidence rules must be retried . . . under the same rules if retrial . . . becomes necessary."

Nevertheless, the evidence was admissible for substantive purposes in support of Appellant's theory that House, not Appellant, stole the money from the crime scene. *Beaty v. Commonwealth*, Ky., 125 S.W.3d 196, 206–10 (2003). Although Appellant was not charged with theft, it was the Commonwealth's theory that theft was Appellant's motive for killing Johnson. Indeed, the indictment charged Appellant with the murder of Johnson "while in the course of robbing her." Thus, evidence that an alleged alternative perpetrator ("aaltperp"), *id.* at 207 n. 3, had both motive and opportunity to steal Johnson's money was relevant to refute the inference that the money that Morris observed in Appellant's possession on the morning of April 2, 1999, had been stolen from Johnson, which created the additional inference that Appellant killed Johnson for her money.

House undoubtedly had the opportunity to steal Johnson's money. The fact that he had participated in the theft of other evidence in police custody was admissible as "reverse 404(b) evidence," *id.* at 207 n. 4, of a motive and intent to steal crime scene evidence in this case. Exclusion of evidence that an "aaltperp" had both the motive and the opportunity to commit the act for which the accused is charged deprives the accused of the Due Process right to present a defense. *Id.* at 207–08. It is immaterial that the excluded evidence in this case tended to prove not that House killed Johnson but only that Appellant did not kill her. *Cf. Johnson v. Brewer*, 521 F.2d 556, 562 (8th Cir.1975) (reversing because of exclusion of evidence showing that government's informer and witness had "framed" another defendant in a similar case).

We recognize that the similarity between the two acts in question (theft of a VCR from the evidence room and theft of money from a crime scene) would not satisfy the high standard of admissibility established for KRE 404(b) evidence offered against an accused. *See Billings v. Commonwealth*, Ky., 843 S.W.2d 890, 893 (1992) (prior acts must be so sufficiently similar to demonstrate a modus operandi). However, as pointed out in the leading case of *United States v. Stevens*, 935 F.2d 1380 (3rd Cir.1991), "a lower standard of similarity should govern 'reverse 404(b)' evidence because prejudice to the defendant is not a factor." *Id.* at 1404. "It is well established that a defendant may use similar 'other crimes' evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him." *Id.* (internal citation and quotation omitted). This is similar to the requirement that proof of guilt be shown "beyond a reasonable doubt" but proof of an affirmative defense need only be shown by a preponderance of the evidence. KRS 500.070(1), (3). If the evidence has relevance, then it should be excluded only upon application of KRE 403 principles, *i.e.*, that its probative value is substantially outweighed by considerations of confusion of the issues, misleading the jury, or undue delay. *Stevens, supra*, at 1405. None of those factors militate against admission of the evidence in this case. That is especially true here where (1) the Commonwealth initiated the issue by asking Appellant if he thought it was odd that the police found no money at the crime scene; (2) the only other persons besides Appellant known to have had access to the crime scene were the paramedic and the police officers who searched the residence; (3) House was the officer who took possession of the purse and change purse; and (4) House did not deny his participation in the previous theft from the police evidence room. Appellant should have been permitted to prove House's participation in the theft and sale of the VCR.

## VI. PROSECUTORIAL MISCONDUCT.

Appellant argues that the Commonwealth improperly argued extra-judicial facts during closing argument. Appellant introduced evidence during the trial showing that both Joy and Owens had been released from custody shortly after giving statements to the Commonwealth inculpating Appellant in Johnson's murder. Specifically, there was evidence that Joy gave his statement on September 27, 1999, and the Commonwealth moved to dismiss charges against him on both September 30 and October 15, 1999; and that Owens gave his statement on September 15, 1999, and was released on shock probation from a ten year sentence for drug trafficking (second offense) on October 11, 1999. In closing argument, the Commonwealth attempted to rebut the implication that Joy had testified against Appellant pursuant to a "deal" with the Commonwealth by stating that while Joy may have had some charges against him dismissed, defense counsel had failed to inform the jury that he still had other charges against him that eventually led to his incarceration. Appellant's objection on the grounds that this fact was not in evidence was overruled.

The Commonwealth argues that this fact was placed into evidence during the testimony of Angie West, the Graves County Circuit Court Clerk. During her testimony she was asked:

> And she [defense counsel] didn't ask you to bring a file about James Joy thereafter, showing he was indicted, where he was convicted, and as a matter of fact, he is on probation at this time, did she?

West responded that defense counsel had not asked her to bring that file and had only requested information on the charges that were dismissed by the Commonwealth. Thus, while West did state that she had not given defense counsel all of Joy's criminal records, she did not testify that he had gone to jail on charges other than the ones that were dismissed. The only alleged "evidence" of Joy's additional conviction is found not in the testimony of the witness but only in the question asked by the prosecutor. And even the prosecutor's question did not indicate that Joy had been incarcerated as a result of another conviction.

A prosecutor's closing argument should be confined to facts in evidence and reasonable inferences drawn therefrom. *Coates v. Commonwealth*, Ky., 469 S.W.2d 346, 348–49 (1971); *Parsley v. Commonwealth*, Ky., 306 S.W.2d 284, 286 (1957); *cf. Garrett v. Commonwealth*, Ky., 48 S.W.3d 6, 16 (2001) (same rule applies to defense closing argument). As we are reversing this case for other reasons, we need not decide whether the prosecutor's injection of an extra-judicial fact during closing argument was misconduct of such an " 'egregious' nature as to deny the accused his constitutional right of due process of law." *Foley v. Commonwealth*, Ky., 953 S.W.2d 924, 939 (1997) (citing *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 411 (1987)). We only note in passing that the remark was intended to rebut evidence that seriously impeached the credibility of one of the Commonwealth's star witnesses. We assume the error will not recur at retrial.

Accordingly, the judgment of conviction and sentence imposed therefor are reversed and this case is remanded to the Graves Circuit Court for a new trial.

LAMBERT, C.J.; GRAVES, JOHNSTONE, KELLER, and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents without separate opinion.