# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# Supreme Court of Kentucky

2019-SC-0637-MR

JOSHUA TATE DAVENPORT                  APPELLANT


ON APPEAL FROM LAUREL CIRCUIT COURT
V.              HONORABLE GREGORY ALLEN LAY, JUDGE
NO. 18-CR-00121


COMMONWEALTH OF KENTUCKY             APPELLEE


## MEMORANDUM OPINION OF THE COURT

## AFFIRMING


A Laurel County jury convicted Appellant, Joshua Tate Davenport, of the murder of his wife, Stephanie Davenport, and tampering with physical evidence. The jury recommended sentences of thirty-five years for murder and five years for tampering with physical evidence, to be served consecutively. In accordance with the jury's recommendation, Appellant was sentenced to forty years' imprisonment and now appeals to this Court as a matter of right. Ky. Const. §110(2)(b).

On appeal, Appellant claims the trial court erred by: (1) admitting a lab report, testimony by a lab technician, and certain portions of a recorded police interview; (2) failing to admit two photographs of Stephanie Davenport; and (3) failing to grant a mistrial.

For the following reasons, we affirm.

# I. BACKGROUND

Stephanie and Appellant married in September 2017 and lived in Corbin in a home owned by Appellant's parents. From December 17, 2017, until March 1, 2018, Appellant was incarcerated for drug crimes. Six days after Appellant's release, Stephanie sent a message to her boss, telling him she would not be at work, as Appellant had bruised her face. A few hours after that message, Stephanie was shot twice at close range. One of the bullets entered the back of her head on the right side and exited the front of her head on the left. The other entered her left abdomen, went through her heart and diaphragm, and exited the left side of her back. Either gunshot would have caused Stephanie's death.

Appellant claimed he found Stephanie after hearing four gunshots and walking outside to determine where they had come from. Appellant then asked his mother if Stephanie had shot herself and asked her to call 911. Police found Stephanie facedown with a .38 caliber revolver partially underneath her body. Later, a neighbor also reported hearing four gunshots—a number which corresponded with the four spent shell casings found in the cylinder of the revolver.

Police were skeptical of Appellant's claims that Stephanie had died by suicide since she had two gunshot wounds. Police also questioned Appellant's story due to the presence of footprints on the right hip of Stephanie's pants.

Appellant and Appellant's brother and son all told police that the day before Stephanie died, she was found kneeling in the backyard holding the

2

revolver in her hand. In his brief, Appellant refers to this incident as an apparent "suicide rehearsal." He also claims Stephanie had tried to overdose on pills. According to Appellant, Stephanie asked him for the revolver on the morning of her death, but he had hidden it from her. The authorities were not notified of any of these events.

In the hours following Stephanie's death, police conducted three interviews with Appellant. During these interviews, officers suspected Appellant was under the influence of drugs, as he was sweating profusely, picked at his hands often, and seemed both agitated and unfocused. Appellant submitted to a urine and blood test, which eventually revealed both methamphetamine and amphetamine in his system. Within a few hours, police charged Appellant in connection with Stephanie's death. On May 3, 2018, Appellant was indicted for murder and tampering with physical evidence.

Lab analysis and findings were critical for the Commonwealth in proving Appellant killed Stephanie. Chief among the critical lab results were gunshot residue tests, which determined that lifts taken from Appellant's hands were consistent with gunshot residue. Furthermore, lab testing revealed presumptive blood stains on Appellant's pants, shoes, and jacket. Lab tests taken during Stephanie's autopsy showed traces of methamphetamine in her urine, but her blood tests showed no evidence of any drugs. Stephanie's blood tests were in contradiction of Appellant's claim that she had attempted to overdose on pills the night before her death.

3

Appellant's blood sample was examined by lab examiner Jason Berry and revealed the presence of methamphetamine and amphetamine. He was unable to opine if Appellant was actually under the influence of methamphetamine either at the time of the crime or when the sample was taken; however, Deputy Medical Examiner Dr. Darius Arabadjief testified the presence of drugs in the blood normally indicates that a person is under the influence of those drugs.

Berry's report analyzing Appellant's blood was completed in May 2018. However, the prosecutor did not receive the lab results until August 30, 2019—the Friday before Labor Day weekend and four days before trial was scheduled to begin; the results were turned over to defense counsel that same day. Appellant filed a motion *in limine* to exclude the lab report, testimony of lab analyst Berry, and statements Appellant made to police concerning the last time he used methamphetamine. Among his main arguments to the trial court, Appellant asserted a lack of pretrial notice and that the evidence violated KRE 404(b)(1) as prior bad acts.

The trial court found the evidence fell within KRE 404(b)(1), and that Appellant was therefore entitled to KRE 404(c) notice. After finding the Commonwealth had provided timely notice, the trial court considered Appellant's argument as to relevancy and withheld final ruling until the parties developed the evidence during trial. After two detectives and the deputy medical examiner testified, the trial court allowed the admission of the evidence.

4

During trial, Appellant sought to introduce two photographs of Stephanie holding a handgun, which the Commonwealth agreed was the same gun involved in her death. The Commonwealth objected to the introduction of the two pictures, arguing they lacked relevance. The trial court sustained the Commonwealth's objection and excluded the photographs.

When the jury retired to deliberate after closing arguments, Stephanie's autopsy report was left on the podium, so the jury did not have it during deliberations. Appellant moved for a mistrial on these grounds, but the trial court overruled his motion. In ruling on the mistrial motion, the trial court noted that witnesses had testified to the pertinent parts of the report and the jury could have examined the report if it had asked to do so; therefore, the trial court found there was no manifest injustice requiring a mistrial.

The jury found Appellant guilty of Stephanie's murder and of tampering with physical evidence. The judge sentenced Appellant to forty years' imprisonment in accordance with the jury's recommendation. Appellant now appeals to this Court.

## II. ANALYSIS

### A. Lab report, Lab Analyst Berry's testimony, and forty-one seconds of recorded police interview

Appellant asserts the trial court erred in admitting a lab report by state crime lab analyst Jason Berry, Berry's testimony about his findings contained in that report, and forty-one seconds of Appellant's recorded interview with police (in which an officer asked him about the last time he used drugs). Appellant alleges four separate grounds relating to this evidence. Specifically,

he claims the trial court erred by: 1) finding the pretrial notice of the report and testimony of Berry was timely, 2) the manner in which it applied KRE 404(b)(1) to the evidence, 3) finding the evidence was relevant and admissible, and 4) determining the probative value of the evidence outweighed its prejudicial effect.

"Rulings upon admissibility of evidence are within the discretion of the trial judge; such rulings should not be reversed on appeal in the absence of a clear abuse of discretion." *Simpson v. Commonwealth*, 889 S.W.2d 781, 783 (Ky. 1994). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Prior to trial, Appellant filed a motion *in limine* and specifically sought to exclude evidence of his "drug content of blood (provided to undersigned counsel on Friday, August 30, 2019, at approximately 3:00 p.m.) and a portion of Defendant's second interview (16:42-17:23)." Appellant claimed the Commonwealth's pretrial KRE 404(c) notice of intent to introduce 404(b) evidence was unreasonable. Appellant also argued in the alternative that if the trial court determined the evidence was not 404(b) evidence or that notice was proper, then the evidence was irrelevant, and its prejudicial effect outweighed its probative value.

In conducting its 404(b) analysis, the trial court first determined the evidence of methamphetamine in Appellant's blood was evidence of a prior crime which required the Commonwealth give Appellant notice of its intention

6

to offer it in evidence. Then, relying on *Dant v. Commonwealth*, 258 S.W.3d 12, 21 (Ky. 2008), the trial court found the Commonwealth gave sufficient notice when it filed notice and provided the lab report to defense counsel four days before trial. The trial court withheld its final ruling concerning the admission of the lab report and testimony about drugs in Appellant's system until further evidence was developed at trial. The trial court indicated that if the testimony reflected on Appellant's state of mind, it was relevant as to his ability to recall facts and the reliability of those facts Appellant related to the detectives during the interviews.

Appellant was interviewed three times by police within hours after the shooting. One of the officers conducting the interviews was Laurel County Sheriff's Office Detective Sergeant Chris Edwards. Edwards's law enforcement background included over thirteen years with the Drug Enforcement Administration task force. Through that work, Edwards developed considerable experience and familiarity with persons under the influence of drugs. In laying a foundation for admission of the statements concerning Appellant's methamphetamine use, the Commonwealth asked Edwards to describe his observations of Appellant during the interviews. Edwards described that Appellant was sweating profusely, visibly agitated, repeatedly picking at his hands, and that Appellant's attention drifted in and out of focus. When the Commonwealth asked Edwards what he deduced from Appellant's actions, Edwards replied it was his opinion that Appellant was under the influence of drugs while giving his statements.

7

After hearing the testimony of Edwards, Bryan Lawson (another Laurel County Sheriff's Office detective who sat in on the interviews), and the Deputy Medical Examiner, Dr. Darius Arabadjief, the trial court ruled the lab report, Berry's testimony regarding the report, and the forty-one seconds of Appellant's interview in question were admissible. Dr. Arabadjief had testified about the difference between drugs found in urine samples and drugs found in blood samples. According to Dr. Arabadjief, the presence of drugs in the blood meant drug use currently affected the person, while presence in the urine meant past usage with no current effect.

Dr. Arabadjief opined Stephanie was not under the influence of methamphetamine when she died because the meth was only in her urine. Appellant had methamphetamine in his blood. Applying that explanation to the lab report showing methamphetamine and amphetamines in Appellant's blood, the trial court ruled the items of evidence in question were relevant and admissible.

While we will address each of Appellant's arguments individually below, we pause first to note that each of these alleged errors would be subject to harmless error analysis. Even if we were to hold the trial court erred, any such error would be harmless. "One of the foremost tests in determining whether an error is prejudicial is consideration of whether upon the whole case there is a substantial possibility that the result would have been any different." *Stiles v. Commonwealth*, 570 S.W.2d 645, 647 (Ky. App. 1978) (internal citations omitted).

8

The overwhelming amount of other evidence in this case—including lab results suggesting the presence of gunshot residue on Appellant's hands, stains which were presumptive for blood on Appellant's clothing, the visible foot print on Stephanie's pants, the fact that Stephanie sustained two independently fatal gunshot wounds (one in back of her head on the right side and one which entered her abdomen on the left side and went through her heart), the deputy medical examiner's conclusion that Stephanie's wounds were not consistent with wounds of a person who shot herself twice, the absence of drugs in Stephanie's system that would have indicated an effort to overdose the previous night (as claimed by Appellant), and the myriad of other evidence contradicting Appellant's version of events— far outweighed any effect the trial court's evidentiary rulings had on the outcome of Appellant's trial.

We conclude there is no substantial possibility the result would have been different in this case even if we were to assume the trial court erred. As noted, however, we will address each of Appellant's arguments in turn.

### 1. *Timeliness*

Appellant first claims the Commonwealth's notice, provided on the Friday before a holiday weekend with the trial set to begin on Tuesday, was untimely. Relying on *Dant*, 258 S.W.3d 12, the trial court found the notice was sufficient. After review, we agree with the trial court's determination and hold *Dant* was applicable and determinative.

The factual circumstances in *Dant* are remarkably similar to those in this case. In *Dant*, notice was provided by "the Commonwealth on the Friday before

a holiday weekend, with the trial beginning on Tuesday." *Id.* at 21. We reiterated "'[t]he intent of KRE 404(c) is to provide the accused with an opportunity to challenge the admissibility of this evidence through a motion *in limine* and to deal with the reliability and prejudice problems at trial.'" *Id.* at 21-22 (quoting *Bowling v. Commonwealth*, 942 S.W.2d 293, 300 (Ky. 1997) (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25 (3rd ed. 1993)).

Here, Appellant's counsel was able to file a motion *in limine* challenging the evidence. In response to that motion, the trial court conducted a hearing and determined the evidence fell within KRE 404(b) and required prior notice. The trial court then found the prior notice provided was sufficient but withheld final ruling on admissibility until after hearing other contextual evidence. We stated in *Dant*, "[s]ince Dant was given actual notice of the Commonwealth's intent to introduce KRE 404(b) evidence in time to adequately challenge its admissibility, we conclude that he did not suffer any prejudice and the trial court did not err in finding that the notice requirement of KRE 404(c) was satisfied." *Id.* at 22. The same is true herein.

As such, we agree with the trial court's determination that the Commonwealth provided timely notice to Appellant.

### 2. KRE 404(b)

Appellant next claims the trial court erred when it allowed the Commonwealth to admit the lab report, Berry's testimony, and forty-one seconds of recorded interview into evidence pursuant to KRE 404(b). From the

outset, we acknowledge that Appellant indicates in a footnote of his brief that counsel could not hear what determination the trial court made with respect to the 404(b)(1) analysis. Counsel asserts "[t]he audio was not clear or loud enough."

After review, we agree it is a bit difficult to hear, but we disagree with counsel's assertion the trial court failed to make a finding. The trial court expressly disagreed with the Commonwealth and found the evidence to fall within 404(b) as it was evidence of other crimes, wrongs, or acts. The court went on to note the available exceptions for the evidence to come in, and then moved to analyze notice and relevance.

Although the audio record is not as clear as it could have been about what actual findings the trial court made, what is clear is that the trial court found the evidence was within 404(b), but was not being offered to prove Appellant had acted in conformity with previously displayed bad character. Further, the trial court's later discernable actions and language clearly indicate the trial court felt the evidence went to Appellant's state of mind at the time of his statements to officers.

The Commonwealth argues the record supports its claim that the evidence went to intent or motive as confirmed by the prosecution's closing argument, which argued Appellant's state of mind was influenced by methamphetamine and was the reason for his claiming Stephanie's death was a suicide.

We hold the record of the trial court's actions, although not memorialized by an entirely clear audio recording, made clear the 404(b) issue was resolved. It can be inferred that by moving onto the issue of relevancy, the trial court had concluded the issue was about Appellant's mental state—his intent. In a slightly different context, we said: "[w]e also do not require trial courts to make detailed written findings to support the many evidentiary rulings they must make in the course of a trial." *Cox v. Commonwealth*, 553 S.W.3d 808, 816 (Ky. 2018). In this circumstance, with a jury waiting and a multi-day trial set to begin, the trial court sufficiently ruled and moved on to an issue that required further testimony to resolve. Neither the Commonwealth nor Appellant objected to or sought clarification of the trial court's determination concerning KRE 404(b), and we find no error in the trial court's conclusion or actions.

### 3. *Relevance*

Appellant next claims neither lab analyst Jason Berry's testimony and report nor a forty-one second clip of Appellant's police interview were relevant. Appellant alternatively argued to the trial court that if the evidence was admissible despite his KRE 404(b) objection, then it should not be deemed relevant. The crux of Appellant's claim focuses on that portion of Berry's testimony in which Berry stated he was unable to determine from his lab analysis exactly when Appellant was acting under the influence of the drugs and when Appellant last ingested methamphetamine.

If the only evidence the Commonwealth offered was the report and Berry's testimony, it may be more difficult for us to determine that it was relevant. However, Berry's lab analysis, report, and testimony must be viewed in the context of the other evidence. "To show that evidence is relevant, only a slight increase in probability must be shown." *Blair v. Commonwealth,* 144 S.W.3d 801, 808 (Ky. 2004).

Within hours of Stephanie's death, Appellant was interviewed at the Laurel County Sheriff's Department by Detectives Sergeant Edwards and Bryan Lawson and a blood sample was taken. When asked about a time frame for methamphetamine to remain in Appellant's blood, Berry responded methamphetamine had a half-life in the blood stream of somewhere between 5 and 30 hours, a range that could include both the time Stephanie was shot and the police interviews.

As noted above, Edwards testified about his observations of Appellant during the interviews. The recordings also reveal Appellant's lack of focus, which resulted in Edwards whistling and slapping the desk to bring Appellant's attention back to the interviews. Edwards did not testify definitively that Appellant was intoxicated—just that he thought Appellant was under the influence due to his actions.

Lab analyst Berry's inability to state the level of influence the drugs had on Appellant, including whether he was intoxicated at the time of Stephanie's death or the interviews, does not make the evidence irrelevant. The trial court relied on *Burton v. Commonwealth,* 300 S.W.3d 126 (Ky. 2009), in finding that

13

evidence of drugs in Appellant's system was relevant to a determination of his mental state at the time he gave interviews with police.

Additionally, where a significant question for the jury is whether a person died by suicide or homicide, what the Appellant had to say close to the event and his state of mind when he said it were important for the jury's consideration. Appellant's version of events did not line up with the other evidence gathered in the investigation. Evidence that Appellant was under the influence of methamphetamine could explain—at least in part—the inconsistences found in Appellant's version of the events.

As Appellant points out, when Berry was asked about possible effects, he could not say if Appellant was intoxicated or when he last consumed drugs. Berry testified those types of conclusions depended on information he did not have—including how much of the drug was taken, the drug's potency, and how fast Appellant metabolized the drugs in his system. The questions posed to Berry exceeded what this type of lab testing can reveal.

The answers sought by Appellant's questions were better addressed to the other witnesses who testified, such as Edwards, who described Appellant's condition and unusual behaviors during the interviews and then concluded he was under the influence of drugs. Dr. Arabadjief also spoke to this evidence, clarifying that drugs found in the blood indicate a current impact on a person. As to the specific question of when Appellant last used drugs, that question was best answered by Appellant in his recorded interview.

14

Merely because the questions posed to Berry were best answered by other witnesses or other evidence does not render the lab report and Berry's testimony irrelevant. When viewed in conjunction with other evidence, as the trial court did, this evidence offered more than the slight probability required for a relevancy determination. As such, the trial court correctly determined the lab report, Berry's testimony, and the forty-one seconds of questioning in the recorded interview were relevant.

### 4. Probative value and prejudicial effect

Appellant finally asserts that the probative value of the lab report, Berry's testimony, and the forty-one seconds of questioning by police about the last time he used drugs was exceeded by its undue prejudice. Appellant proclaims that once the jury found out he had methamphetamine in his system, the verdict was a foregone conclusion because the use of drugs carries a stigma that labelled him a "Meth Head." Further, Appellant claims that since the evidence failed to show he was impaired at the time of the occurrence, it merely served to create an inference he was more likely to commit a murder and therefore painted him in a bad light.

First, we note "[i]t is within the sound discretion of the trial judge to determine whether the probative value of evidence is outweighed by its possible prejudicial effect and to admit or exclude it accordingly." *Rake v. Commonwealth*, 450 S.W.2d 527, 528 (Ky. 1970). Furthermore, "[a] ruling based on a proper balancing of prejudice against probative value will not be

disturbed unless it is determined that a trial court has abused its discretion." *Bell v. Commonwealth*, 875 S.W.2d 882, 890 (Ky. 1994).

"This deference to the trial court's discretion arises from our recognition that the trial court has a 'superior view' of the evidence and is better situated to assess its nuances." *Jackson v. Commonwealth*, 481 S.W.3d 794, 797 (Ky. 2016) (quoting *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015)). As such, "[t]he test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

Here, the trial court relied on *Burton*, 300 S.W.3d at 133. Appellant had been indicted for murder and at the point the evidence was offered, it remained to be determined if the trial court would find the evidence supported jury instructions containing wanton, intentional, or reckless mental states. "One way to prove wantonness is to show that the defendant in a vehicle-homicide [,or injury,] case was driving while intoxicated." *Id.* As wantonness was an issue relating to what mental state would potentially be included in the court's jury instructions, assuming a directed verdict was not granted, evidence concerning Appellant's mental state was relevant. The trial court did not act unreasonably or arbitrarily in finding the evidence in question was relevant.

Since we already held the trial court correctly found the evidence was relevant, the question becomes was that relevance overcome by undue prejudice. Our analysis begins with a recognition that all evidence offered by

the Commonwealth against a defendant carries with it some degree of prejudice, so our focus is on whether the prejudice was "undue."

In evaluating what is "undue" prejudice we recently quoted Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.10[4][b] (4th ed. 2003) (internal citations omitted):

> What is contemplated as "unfairly" or "unduly" prejudicial is evidence that is harmful beyond its natural probative force: "Evidence is unfairly prejudicial only if . . . it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'"

*McLemore v. Commonwealth*, 590 S.W.3d 229, 234 (Ky. 2019).

Does the word "methamphetamine" provoke the "instinct to punish" just by its mention? Sadly, methamphetamine and the consequences of its use are not unfamiliar to Kentucky citizens. However, the use and consequences of other illegal drugs such as fentanyl, heroin, and cocaine are likewise not unfamiliar to potential Kentucky jurors. Unfortunately, drugs such as these are often evidence in criminal cases and cannot be routinely excluded in cases simply because jurors may be aware of them.

Rather than excluding evidence of high profile drugs because of their notoriety to jurors, we recognize that those jurors who have strong feelings and life or family experiences involving drugs like methamphetamine may not be suitable to sit as a juror on a given case. It would be rare indeed to find a family that has not been touched by the drug epidemic in Kentucky. Appellant's argument assumes that evidence of his drug use would predispose the jury to convict. However, the opposite could also hold true: the juror's

17

experiences trying to help family or friends may engender sympathy for someone in the clutches of drugs. Experience gained over time has made clear that voir dire is the best method to identify those potential biases and deal with issues.

Peremptory and for-cause strikes are available to assist counsel if juror bias would affect a given juror's ability to fairly sit on a case. A good example of this application can be found in Appellant's voir dire on another sensitive topic in this case. In response to counsel's questions about suicide, several jurors asked to approach the bench and were questioned individually. After questioning, three jurors were excused for cause based on their answers to questions on this topic. However, in contrast, no questions about methamphetamine and possible juror life experiences surrounding that drug were asked.

Further, if the entire panel had been too affected by a specific drug's abuse in a community, such as Appellant claims is the issue with methamphetamine, and an unbiased jury cannot be found, our rules provide the trial court with options to obtain more jurors or to move the case to a different locale for trial. Here, the record reveals no requests for more jurors or for a change of venue in this case.

Although the trial court reserved ruling on the admissibility of the methamphetamine evidence until it heard witness testimony, the jury's reaction to methamphetamine could have been broached during voir dire. Counsel could reasonably anticipate the jury was going to hear testimony

18

about methamphetamine found in Stephanie's urine because of the deputy medical examiner's autopsy report. Counsel for either side, or both sides, would undoubtedly ask about that finding. Methamphetamine was a fact in the case regardless of the trial court's ultimate finding concerning the motion *in limine.*

If the trial court excluded the evidence objected to in the motion *in limine,* then Appellant would not have been harmed by asking about methamphetamine, because it also applied to Stephanie. However, if the trial court allowed the evidence, juror bias could have been exposed by appropriate questioning. Dealing with the issue of potential juror prejudice during voir dire is a better way to handle difficult issues rather than imposing a blanket rule excluding relevant, albeit potentially emotionally charged, evidence.

After review of the record, we conclude the trial court did not abuse its discretion in admitting the evidence of the lab report, lab analyst Berry's testimony, and the forty-one seconds of recorded interview. The prejudicial effect of the evidence was not so undue as to outweigh its probative value.

## B. Photographs of Stephanie

Appellant next argues the trial court erred in denying admission of two sexually suggestive "boudoir photographs" of Stephanie. The two photographs display Stephanie in a revealing, black, lowcut top, wearing heavy makeup, and holding a revolver (which all parties agree is the same gun used in Stephanie's death).

19

The Commonwealth objected to the photographs based on relevancy and noted there had been no testimony about when the pictures were taken. Appellant argued the "very dark and disturbing" photos would help lead the jury to conclude Stephanie died by suicide.

In his brief, Appellant's counsel clearly mischaracterizes the photographs to this Court. Counsel claims they show Stephanie "with a handgun held in her right hand up to her head and pointed at the same position as the entry wound discovered by law enforcement officers on her body." That assertion is glaringly inaccurate. Counsel even concedes his blatant mischaracterization in his reply brief, but claims it was his "understanding and good faith belief at the time." Nonetheless, counsel maintains his argument that the trial court abused its discretion in denying admission of the photographs.

Initially, the trial court found it was not unusual for people to have pictures taken with their guns and noted the suggestive nature of the photographs were not indicative of suicide. The trial court then sustained the Commonwealth's objection at that time but left the door open for Appellant to renew his request for admission if other evidence came to light. The trial court found the prejudicial effect of the photographs greatly outweighed their probative value, and the pictures could potentially confuse the issues and mislead the jury.

A defendant has a right to present a defense, which includes photographs; however, that right is not without limits nor outside the Rules of

Evidence. In a prior case where we sustained the trial court's exclusion of both gruesome and family photographs offered by the defense, we said:

> Appellant asserts that the evidence was admissible because it was probative of his mental state at the time of the crimes. No doubt, Appellant has a constitutional right to a fair opportunity to present a defense. *Crane v. Kentucky,* 476 U.S. 683, 690-91, 106 S.Ct. 2142, 2146-47, 90 L.Ed.2d 636 (1986); *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *Beaty v. Commonwealth,* Ky., 125 S.W.3d 196, 206-07 (2003). The exclusion of evidence violates that constitutional right when it "significantly undermine[s] fundamental elements of the defendant's defense." *United States v. Scheffer,* 523 U.S. 303, 315, 118 S.Ct. 1261, 1267-68, 140 L.Ed.2d 413 (1998).

*Hughes v. Commonwealth,* No. 2002-SC-1081-MR, 2004 WL 2624053, at *17-18 (Ky. Nov. 18, 2004).

The trial court's exclusion of the two photographs did not undermine fundamental elements of Appellant's defense. We conclude, as the trial court did, that the photographs did not contribute anything to answering the question of whether Stephanie died by suicide. Other evidence admitted in this case, including a letter written by Stephanie, went directly to the question of whether she took her own life.

Appellate review of evidentiary rulings on admission of evidence, such as excluding the photographs in this case, is conducted under an abuse of discretion standard, and "[t]he test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

Here, the trial court found the photographs lacked relevancy. KRE 401 defines relevant evidence as "having any tendency to make the existence of any

21

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Appellant argues the issue to be determined was whether Stephanie's death was suicide or homicide, and that the jury could look at the photographs and conclude Stephanie died by suicide. However, Appellant offers no further support for that contention once he admitted the pictures do not, in fact, show Stephanie pointing the gun at her head.

Appellant's mere description of the photographs as "very dark and disturbing" is insufficient absent additional information or testimony to connect it to the question of Stephanie's claimed suicide. The trial court left open the door for additional evidence, but none was presented; therefore, the trial court did not abuse its discretion in determining the photographs were not relevant at the time they were offered.

In the photographs, there is no connection to the backyard where Stephanie died, and there was no indication that Stephanie's death occurred during some type of fantasy enactment or roleplay. Photos of Stephanie in a suggestive and revealing outfit do not shed light on her death, while wearing a t-shirt and jeans. Finally, the photos are not dated, so the possibility exists they were taken before she met and married Appellant, which was only six months prior to her death. Last, proximity of the photographs to Stephanie's death, or any suicidal behavior, was never established.

The trial court further found the photographs had potential to mislead the jury and confuse the issues. In comparison, we point to Stephanie's letter

22

to Appellant describing her struggle with depression. The letter was admitted and clearly relevant to helping the jury answer the question of whether Stephanie's death was homicide or suicide. Any probative value of the two photographs was greatly exceeded by their prejudicial effect.

The trial court did not abuse its discretion in disallowing Appellant to admit these photographs into evidence.

## C. Denial of Mistrial Motion

Last, Appellant asserts the trial court erred in failing to grant a mistrial when it was discovered that Stephanie's autopsy report had been left in the courtroom and not included with the other trial exhibits provided to the jury during deliberations. The autopsy report included deputy medical examiner Dr. Arabadjief's cause and manner of death findings, a wound location drawing he prepared as part of the autopsy, and Stephanie's toxicology lab results. Following guilt/innocence deliberations, the autopsy report was found on a podium in the courtroom and Appellant moved for a mistrial.

After considering Appellant's motion and the Commonwealth's response, the trial court noted the jury had heard all pertinent information contained in the report and had not asked to see the report during deliberations. Finding no manifest necessity had occurred, the trial court overruled the motion.

Appellate review of a trial court's decision concerning a mistrial is generally one of deference.

> It is well established that the *decision to grant a mistrial is within the trial court's discretion, and such a ruling will not be disturbed absent a showing of an abuse of that discretion.* Moreover, a

23

*mistrial is an extreme remedy* and should be resorted to only when there is a fundamental defect in the proceedings and there is a manifest necessity for such an action. The occurrence complained of must be of such character and magnitude that a *litigant will be denied a fair and impartial trial* and the prejudicial effect can be removed in no other way.

*Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky. 2004) (internal quotations and citations omitted) (emphasis added).

"[A] finding of manifest necessity is a matter left to the sound discretion of the trial court." *Commonwealth v. Scott*, 12 S.W.3d 682, 684 (Ky. 2000). Further, "[a]lthough a trial court is vested with discretion in granting a mistrial, the power to grant a mistrial ought to be used sparingly and only with the utmost caution, under urgent circumstances, and for very plain and obvious causes." *Id.* at 685.

Appellant claims jury deliberations were impeded when the autopsy report did not accompany the jury. According to Appellant, the jury not having the report meant Stephanie's lab report showing methamphetamine in her urine was not available for the jury's review, and, therefore, the jury was less likely to infer that the location of a bruise on Stephanie's face was possibly caused by falling after she was shot instead of from Appellant assaulting her. Appellant asserts a real and tangible prejudice resulting in a manifest necessity for a mistrial occurred, and there was no other remedy for the report being left on the podium during deliberations.

A review of Dr. Arabadjief's testimony supports the trial court's determination that the pertinent evidence contained in the report had been presented at trial. Addressing Appellant's specific concerns, the record reveals

24

Dr. Arabadjief testified about the methamphetamine in Stephanie's urine and opined she was not under the influence at the time of her death, but she had used meth at some point. During cross examination, Appellant elicited from Dr. Arabadjief that the bruise on Stephanie's forehead was consistent with a forward-facing fall from a standing position. In closing argument, Appellant reminded the jury about the methamphetamine present in Stephanie's urine and about the fall being a possible source for the facial bruise.

The Commonwealth asserts any error concerning the report remaining in the courtroom was harmless. Defining harmless error, RCr 9.24, reads in pertinent part:

> no error or defect . . . in anything done or omitted by the court or by any of the parties, is ground for . . . disturbing a judgment . . . unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.

In this case, the two grounds raised by Appellant were subjects of Dr. Arabadjef's testimony before the jury; and as the trial court noted, the jury did not ask to see the report while deliberating. We conclude that any error in leaving the report on the podium during deliberations was harmless.

Furthermore, there is not a plain and obvious cause for a mistrial, and as such, any error resulting from leaving the autopsy report in the courtroom did not create a manifest necessity for a mistrial. We hold the trial court did not abuse its discretion when denying Appellant's motion for a mistrial.

25

## III. CONCLUSION

For the foregoing reasons, we affirm Appellant's convictions and corresponding sentences.

All sitting. All concur.

COUNSEL FOR APPELLANT:

John A. Combs
Combs Law, PLLC

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Perry Thomas Ryan
Assistant Attorney General